**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**ENOCH WILDER,**

**Plaintiff,**

**v.**

**RICK SUTTON, JULIUS FLAGG,**
**MARK PIERSON, JOHN EVANS,**
**MELODY FORD, and WILLIAM WATTS,**

**Defendants.**                                          **No. 04-cv-874-DRH**

**MEMORANDUM and ORDER**

**HERNDON, Chief Judge:**

### I.  Introduction and Background

Pending before the Court is Defendants' motion for summary judgment
(Doc.80).  Plaintiff opposes the motion (Doc. 84).  Based on the following, the Court
grants in part and denies in part the motion.

Plaintiff Enoch Wilder, an inmate in the custody of the Illinois
Department of Corrections currently housed at Lawrence Correctional Center, filed
suit against Defendants for deprivations of his civil rights that he claims occurred at
Pinckneyville Correctional Center pursuant to 42 U.S.C. § 1983 (Doc. 1).  On August
15, 2006, the Court conducted its 28 U.S.C. § 1915A review of Wilder's complaint
(Doc. 8).  In that Order, the Court, based on the allegations in the complaint, set forth

the following as the relevant facts surrounding Wilder's claims:

> Plaintiff states that he was transferred to Pinckneyville Correctional
> Center on January 10, 2003.  At the time of transfer, he identified
> himself as a practitioner of the Wiccan religion.  Plaintiff submitted
> "request slip after request slip" seeking a meeting with Defendant
> Sutton so that he might obtain the materials necessary for the practice
> of his religion.  Plaintiff informed Defendant Flagg, Assistant Warden of
> Programs, that Defendant Sutton had not responded to his requests.
> Defendant Flagg told him to keep submitting requests.  After a few more
> weeks of his requests being ignored, Plaintiff wrote an unspecified
> number of letters to Defendant Pierson, Chief Administrative Officer at
> Pinckneyville Correctional Center, informing him of his desire to
> practice his religion and Defendant Sutton's failure to respond to his
> requests.  Defendant Pierson did not respond in writing to Plaintiff's
> requests, but when Plaintiff saw him in person and asked him about his
> letters, Defendant Pierson told Plaintiff, "you must go through the
> Chaplaincy Department."
> Because Plaintiff believed he had no other recourse, on November 19,
> 2003, he began filing grievances.  In response, he was informed that he
> needed to submit a documented list of necessary items to Defendant
> Sutton.  Plaintiff did so, but that request was also ignored.  Plaintiff
> later saw Defendant Sutton, asked about the requests, and was
> informed that "your religion is not allowed to be practiced at PCC."
> Defendant Sutton also told Plaintiff that his request[s] were being
> reviewed by Defendant Watts, Chief Chaplain of the Religions Practice
> Advisory Board in Springfield.  After "a long period of time elapsed"
> without response from either Defendant Sutton or Defendant Watts,
> Plaintiff wrote a letter to Defendant Watts personally, asking that he be
> allowed to practice his religion.  During that same time, Plaintiff was
> also seeking relief through the prison's grievance system. All grievances
> were denied for various reasons at the prison level and later by
> Defendant Evans and Defendant Ford at the Administrative Review
> Board.

(Doc. 8, ps. 2-3).

Thereafter on January 3, 2007, Wilder filed an amended complaint

based on the above incidents (Doc. 21).  The Amended Complaint alleges that while

he was housed at Pinckneyville Correctional Center, the Defendants (1) impeded the

practice of his religion in violation of the First Amendment; (2) denied him his equal protection rights insofar as they have placed burdens on his religious practices not applicable to other religions, in violation of the Fourteenth Amendment; (3) violated the Religious Land Use and Institutionalized Persons Act (42 U.S.C. § 2000cc-1); and committed negligence under Illinois law due to violations of the "Unified Code of Corrections." Specifically, Wilder alleges that Defendants: (1) failed to recognize his religion as being legitimate; (2) failed to permit him to purchase and use "ritual utensils" essential to the practice of his religion; and (3) failed to permit him to use the prison chapel for worship. Wilder sued Defendants in their individual and official capacities. He seeks declaratory judgment, injunctive relief, compensatory and punitive damages and free room and board.

As to Chaplain Sutton, Wilder's amended complaint alleges that upon arriving at Pinckneyville in January 2003, he asked Sutton about making arrangements to practice his Wiccan religion. Sutton directed Wilder to fill out a request slip to meet with Sutton. Wilder did not receive a response to his request slip, but was subsequently told by his counselor to send Sutton a list of items needed and verification of their religious necessity. Wilder sent the verified list, to no avail. Wilder alleges that Sutton told him "Your religion is not allowed to be practiced at PCC."

As to Julius Flag, Wilder's amended complaint alleges that he told Flagg that Sutton had not responded to the written requests and that Flagg told Wilder that he was not a chaplain and that Wilder should continue to use the request procedures.

As to Warden Mark Pierson, Wilder's amended complaint alleges that he wrote and spoke to Pierson regarding Sutton and Flagg's inaction and that Pierson instructed Wilder to make his requests through Sutton.

As to Warden Evans, Wilder's amended complaint alleges that after ten months of inaction, Wilder turned to the grievance process, which passed his grievance about being prevented from practicing his religion to Warden Evans, who denied the grievance.

As to Melody Ford, Wilder's amended complaint alleges that he appealed the denial of his grievance to the Administrative Review Board. The Administrative Review Board, by and through Ford, rejected the grievance because the paperwork did not indicate Wilder had submitted it through a grievance officer. Wilder wrote to Ford indicating he sent the missing documentation separately and asked Ford to rectify her mistake, to no avail.

As to William Watts, the amended complaint alleges that Wilder's counselor forwarded Wilder's verified list of religious items to Watts, who chaired the Religious Practice Advisory Board.

On February 22, 2007, the Court adopted a Report and Recommendation submitted by Magistrate Judge Proud, granted Defendants' motion for summary judgment and dismissed Wilder's cause of action for failure to exhaust administrative remedies (Doc. 55). Wilder appealed the Court's Order on March 20, 2008 (Doc. 56). On March 5, 2009, the Seventh Circuit issued its Mandate vacating the Court's Order regarding exhaustion and remanded the case for further

proceedings (Doc. 72).   Thereafter, Defendants filed a renewed motion for summary

judgment (Doc. 80).   Wilder filed his opposition to the motion (Doc. 84) and

Defendants filed a reply (Doc. 85).  As the matter is ripe, the Court turns to address

the merits.

### III.  <u>Summary Judgment Standard</u>

Under Federal Rule of Civil Procedure 56(c), a movant is entitled to

summary judgment when the pleadings, depositions, answers to interrogatories, and

admissions on file, together with any admissible affidavits, demonstrate there is no

genuine issue of material fact and that the movant is entitled to judgment as a matter

of law. **Fed.R.Civ.P. 56(c);** *Celotex Corp. v. Catrett*, **477 U.S. 317, 322, 106 S.Ct.**

**2548, 91 L.Ed.2d 265 (1986)**. A genuine issue of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248, 106 S.Ct. 2505, 91**

**L.Ed.2d 202 (1986)**.

When reviewing a motion for summary judgment, the court must view

the facts in the light most favorable to the nonmoving party and draw all reasonable

inferences in that party's favor.  ***See Schuster v. Lucent Tech., Inc.*, 327 F.3d**

**569, 573 (7th Cir. 2003)**.  At summary judgment, the "court's role is not to evaluate

the weight of the evidence, to judge the credibility of witnesses, or to determine the

truth of the matter, but instead to determine whether there is a genuine issue of

triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, **528 F.3d 508,**

**512 (7th Cir. 2008)**.

It is significant to note that Wilder is proceeding *pro se* herein.  The pleadings of *pro se* litigants should not be held to the same stringent standards as pleadings drafted by formally trained lawyers; instead they must be liberally construed.  ***See Kyle II v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999)(citing *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 378 (7th Cir. 1988)(pro se complaints/pleadings are to be liberally construed.))  *See also Cruz v. Beto*, 405 U.S. 319, 322 (1972)**.

### III.  <u>Facts</u>[1]

Wilder was incarcerated at Pinckneyville from January 2003 to January 2007.  In January 2007, Wilder was transferred from Pinckneyville.  Wilder is a member of the Wiccan religion and has been since 2001.  In January or February 2003, Wilder asked Chaplain Sutton how to go about practicing his religion.  Consistent with 20 Ill.Admin.Code § 425.110, Sutton directed Wilder to submit a request slip.[2]  Wilder submitted 5 to 10 such requests.  On November 19, 2003, Wilder filed a grievance indicating that Sutton had denied his request and argued that the following items did not pose a risk to security: incense, candles, herbs, tarot

---

[1]As the Seventh Circuit noted, the basic underlying facts are not disputed.

[2]**20 Ill.Admin.Code § 425.110** - Requests for Religious Accommodations reads:
(a): Inmates requesting religious items must "submit the request in writing to the facility chaplain and shall be required, if requested by the facility chaplain or the Religious Practice Advisory Board, to include written verification from an outside faith group or from a religious authoritative source that the religious item is necessary for the practice of the committed person's religion or that the item is a symbol of integral part of the person's religion."

decks, altar cloths, chalices, bells, a cauldron and a wand.  On December 2, 2003,

Wilder's correctional counselor responded, "Per Chaplain Sutton, you must provide

a complete list of what you need along with verification (documents) in order for

these items to be used in your worship."  Chaplain Sutton acknowledged requesting

a faith leader's list of Wiccan religious utensils.

A December 23, 2003 letter from the Reverend Paul V. Beyerl of the

Rowan Tree Church, listed three categories of items: (1) items "considered very

desirable for the working of. ... primary religious ceremonies," such as incense,

herbs, altar cloth, altar bowl, candles, wand, chalice, pentacle and oils; (2) items

"considered very important for the practice or study of ... [the] religion," such as

mortar and pestle, rune stones, amulets, and quartz crystals; and (3) items that are

"desirable but may be considered security risks," such as knife, cauldron (under 9"

diameter), and a ritual broom.  When Wilder did not receive any response from

Chaplain Sutton, he filed a second grievance on February 8, 2004, to which his

correctional counselor responded "Per Chaplain Sutton your list will be sent to the

Religious Practice Advisory Board in Spfld. for their decision.  You should have sent

him the list <u>before</u> you wrote a grievance."

In April and May 2004, Wilder wrote to the Administrative Review

Board, Chaplain Sutton and the Religious Advisory Board seeking action on his

grievance/request.  The Advisory Board declined to approve the items on Wilder's list.

Wilder's February 2004 grievance was denied March 17, 2004, while the Religious

Practice Advisory Board was still considering Wilder's list.   There is no

documentation evincing a final decision regarding Wilder's request for religious materials and the opportunity to hold Sabbat.  Prior to Wilder filing suit in November 2004, he was not allowed religious utensils and the opportunity to hold Sabbat.

Title 20 of the Illinois Administrative Code, Ch.1, pt. 425 pertains to Chaplaincy Services and Religious Practices and is mirrored in IDOC Administrative Directive No. 04.25.101.   The following Administrative Rules are of particular relevance:

**20 Ill.Admin.Code § 425.30 -Accommodation of Religious Beliefs**

(a) Committed Persons shall be provided reasonable opportunities to pursue their religious beliefs and practices subject to concerns regarding security, safety, rehabilitation, institutional order, space and resources.

**20 Ill.Admin.Code § 425.40 - Religious Practice Advisory Board**

(b)(2)(A-C): The Advisory Board is to "review and make recommendations" regarding religious grievances, inmate requests for "non-traditional religious symbols" and "religious items," and requests for "religious activities not currently offered at the correctional facility."

**20 Ill.Admin,Code § 425.90 - Religious Items**

(b) and (c)(1-2): Inmates may have "two traditionally accepted religious symbols or religious symbols which have been authorized by the Religious Practice Advisory Board and which represents their designated faith; items may be limited, restricted or denied based on safety and security concerns; religious symbols cannot exceed

two inches in height or width; and certain items such as candles and incense, are restricted to use for religious activities only and must be stored in a designated area and used only "during approved religious activities held in the chapel or other designated common area."

**20 Ill.Admin.Code § 425.110 - Requests for Religious Accommodations**

(a): Inmates requesting religious items must "submit the request in writing to the facility chaplain and shall be required, if requested by the facility chaplain or the Religious Practice Advisory Board, to include written verification from an outside faith group or from a religious authoritative source that the religious item is necessary for the practice of the committed person's religion or that the item is a symbol or integral part of the person's religion.

## IV.  Analysis

**First Amendment "Free Exercise" Clause Claim**

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." ***Turner v. Safley*, 482 U.S. 78, 89 (1987); accord *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)(regulation impacting practice of religion)**.  This is because prison administrators, not courts, are in the best position to make judgments concerning institutional operations.  ***Turner*, 483 U.S. at 89.**  To establish a constitutional violation, the prisoner must show the restriction substantially burdens the exercise of a constitutional right.  ***Nelson v. Miller*, 570**

**F.3d 868, 877 (7th Cir. 2009);** *see also Koger v. Bryan*, **523 F.3d 789, 799 (7th Cir. 2008)(requirements that diet be compelled by religion and verified by clergy can created substantial burden)**.   A substantial burden exists when there is "'substantial pressure on an adherent to modify his behavior and his beliefs.'" *Kroger*, **523 F.3d at 799 (quoting** *Thomas v. Review Bd of Ind. Employment Sec. Div.*, **450 U.S. 707, 718 (1981))**.  Once the prisoner makes this showing, the Court must determine whether a restriction is reasonable by examining: (1) whether there is a valid, rational connection between the prison regulation and the government interest offered to justify the regulation, (2) whether there are alternative means of exercising the right upon which the regulation infringes, (3) the extent of the impact accommodating the constitutional right would have on the guards, inmates and institutional resources, and (4) whether there is an absence of a ready alternative to the regulation.  *Turner*, **482 U.S. at 89-91**.

The inmate has the burden of disproving the validity of a challenged prison regulation.  *Overton v. Bazzatta*, **539 U.S. 126, 132 (2003)**.  Within the state penal system context, federal courts afford deference to the decisions of prison administrators.  *Turner,* **482 U.S. at 89-91**.  The prison may implement any neutral policy as long as the policy was not designed to interfere with religious practice. *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, **508 U.S. 520, 531 (1993);** *Borzych v. Frank*, **439 F.3d 388, 390 (7th Cir. 2006)**.

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §

2000cc-1, provides:

> No government shall impose a substantial burden on the religious
> exercise of a person residing or confined to an institution, ... even if the
> burden results from a rule  of a general applicability, unless the
> government demonstrates that imposition of the burden on that person
> (1) is in furtherance of a compelling governmental interest; and (2) is
> the least restrictive means of furthering that compelling governmental
> interest.

**42 U.S.C. § 2000cc-1(a)**.

To establish a claim under the RLUIPA, a prisoner must show that a prison receiving

federal funds has enacted a regulation that renders his exercise of a religious practice

*effectively impractical*.  **See 42 U.S.C. § 2000cc-1;** *Koger*, **523 F.3d at 796;** *Civil*

*Liberties for Urban Believers v. City of Chicago*, **342 F.3d 752, 761 (7th Cir.**

**2003)**.   If the inmate succeeds, the burden shifts to the prison officials to

demonstrate that the regulation is the least restrictive means of furthering a

compelling government interest. *See* **§ 2000cc-1;** *Koger*, **523 F.3d at 796;** *Nelson*,

**570 F.3d at 877**.  A prison has a compelling interest in maintaining security, *see*

*Borzych*, **439 F.3d at 391;** *Rios v. Lane*, **812 F.2d 1032, 1037 (7th Cir. 1987)**,

and the courts are particularly deferential to the judgment and expertise of prison

administrators when analyzing whether a regulation is necessary to further that

interest, *see Cutter v. Wilkinson*, **544 U.S. 709, 722-23 (2005);** *Koger*, **523 F.3d**

**at 800**.[3]

Defendants argue that the restrictions on religious practice serve a legitimate and compelling penological purpose related to the safety, security and order and that these restrictions are the least restrictive means of doing so. Defendants contend that Chaplain Sutton told Wilder that he could not keep candles and incense in his cell but that those items could be used in a designated common area. As to the non-traditional religious items contained in the Rowan Tree Church list, the Defendants assert that Sutton, Pierson, Flagg and Evans all relied upon the Religious Advisory Board to recommend the approval or disapproval of non-traditional items. Further, Defendants contend that the Rowan Tree Church list did not adequately describe the shape and size of the items therefore the Advisory Board did not recommend that Wilder's request be approved due to concerns for safety, security and institutional order. Wilder argues that the rationale that Defendants now seek summary judgment are different from what they told him when they denied his requests. He claims that he was never told that he could practice his religion and perform rituals in a designated area and that he was not told about security concerns regarding candles and incense in his cell.

The Court notes that it must defer to Defendant's expertise in the types of security issues/problems that may be posed in IDOC facilities. Construing the

---

[3]In **Nelson,** the Seventh Circuit observed that a Section 1983 First Amendment claim and a RLUIPA claim use the same substantial burden test, so free exercise jurisprudence is used for interpreting RLUIPA claims. **Nelson, 570 F.3d at 877**.

evidence in the light most favorable to Wilder, the Court finds that questions of

material fact exist as to whether Wilder was told that he could practice his religion

in the designated area or not and whether Defendants acted for an improper

purpose.  There is nothing in the record indicating the rationale given to Wilder for

denying him the items on the Rowan Tree Church list.  Defendants' affidavits only

address candles and incense and summarize the regulations.  There is no indication

that Wilder was asked to provide such information and the regulations do not

specifically require the submission of a size to the Religious Practice Advisory Board.

The Court finds that there is sufficient evidence to raise a factual issue regarding

Defendants' veracity and whether the acted for an improper purpose.   Thus,

summary judgment is not proper on this claim.

**The Fourteenth Amendment Claim**

> [T]he "Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination rather that erroneous or even arbitrary administration of state powers...." *Briscoe v. Kusper*, 435 F.2d 1046, 1052 (7th Cir. 1970).  A plaintiff "must demonstrate intentional or purposeful discrimination" to show an equal protection violation. *Bllomenthal v. Lavelle*, 614 f.2d 1139, 1141 (7th Cir. 1980). "'Discriminatory purpose' however, implies more than intent as to volition or intent as awareness of consequences." *Personnel Administrator of Massachusetts v. Feeny*, 442 U.S. 256, 279 (1979). It implies that the decision-maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on an identifiable group. *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982).

*David K. v. Lane*, **839 F.2d 1265, 1271-1272 (7th Cir. 1988);** *see also Turner*

*v. Safley*, **482 U.S. at 89("when a prison regulation impinges on inmates'**

**constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'**).

Defendants argue that they are entitled to summary judgment as the prison policies are religiously neutral and there is no evidence that Wilder was targeted or treated differently due to his religious beliefs.  In response, Wilder maintains that Jewish inmates are allowed to use candles in worship but that he is not.  Wilder also argues that Chaplain Sutton told him that his religion was not allowed to be practiced at Pinckneyville.

Again, the Court finds that there are questions of fact surrounding this claim.  Construing the evidence in the light most favorable to Wilder, the Court finds that there are questions of fact of whether Wilder was treated differently because he is a Wiccan.  Moreover, these are credibility issues which are for the jury to decide and are not proper for the Court to decide during summary judgment.   Thus, the Court denies the motion on this issue.

**Personal Involvement**

Defendants Pierson and Evan assert that they are entitled to summary judgment as the did not participate in the alleged events and therefore lack the required personal involvement.  Wilder maintains that Pierson and Evans are both liable in their capacity as chief administrator the prison and for any action by their agents.  Wilder contends that he wrote to and spoke directly with Pierson regarding Sutton and Flagg's inaction on the request for religious items and that Pierson

instructed him to make his requests through Sutton.

Liability under 42 U.S.C. § 1983 requires a defendant's direct personal involvement. *Gentry v. Duckworth*, **65 F.3d 555, 561 (7th Cir. 1995)**. Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under § 1983, an individual defendant must have cause of participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, **430 F.3d 809, 810 (7th Cir. 2005)**. The doctrine of *respondeat superior* does not apply to actions filed under 42 U.S.C. § 1983. *See Sanville v. McCaughtry*, **266 F.3d 724, 740 (7th Cir. 2001)**. To be held liable under 42 U.S.C. § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference."

The wardens, to whom grievance dispositions were sent for review, are not entitled to summary judgment on this ground. They contend that they cannot be responsible because they did not personally review or make the final decision concerning Wilder's requests for religious items.

Under 20 Ill. Admin. Code § 504.805(a), the Warden may delegate his duty to review inmate grievances. Nevertheless, he may not play a "shell game," delegating responsibility without disclosing to whom it is delegated, then denying personal responsibility when a prisoner seeks to hold him accountable. While it would be unreasonable for a prisoner to believe that the head of a state department

of corrections would give personal attention to every inmate letter, it is not
unreasonable for prisoners to believe that the warden reviews their grievances when
they are purportedly signed by him.[4]   It is, of course, not the Court's business to tell
the wardens how to do their jobs.  But IDOC regulations place him on the hook of
personal responsibility, and they cannot expect to be taken off without putting
someone else on it.  Therefore, the Court finds that Defendants Pierson and Evans
are not entitled to summary judgment regarding personal involvement.

**Qualified Immunity**

Defendants argue that they are entitled to qualified immunity because
the current law dictates that summary judgment be granted in their favor.  Wilder
counters that material questions of fact remain that preclude the analysis of the
applicability of qualified immunity.

Qualified immunity protects government officials "from liability for civil
damages insofar as their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known."  ***Harlow v.
Fitzgerald*, 457 U.S. 800 (1982)**.  ***Saucier v. Katz*, 533 U.S. 194 (2001)**,
required a court to follow a two-step process in analyzing a claim of qualified
immunity.  First, the court must determine whether the facts as alleged by a plaintiff
show a violation of a constitutional right.  If so, the court must then determine

---

[4]The Seventh Circuit noted:  "Ultimately it was the warden's duty to decide what religious
items Wilder could gain access to, and all of Wilder's grievances were directed appropriately to that
end."  (Doc. 72-1, p. 7).

whether the right was "clearly established" at the time of the defendant's actions. ***Saucier*, 533 U.S. at 201**. However, courts are no longer required to proceed in that manner. In ***Pearson v. Callahan*, – U.S. – 129 S.Ct. 808, 818 (2009)**, the Supreme Court held that the ***Saucier*** sequence is not longer mandatory. Rather, a court may use its discretion in determining which of the two prongs of the test should be analyzed first.

  The claims and allegations contained in Wilder's amended complaint are not novel legal theories and were clearly established at the time alleged in the amended complaint, thus, Defendants are not entitled to qualified immunity.

## RLUIPA – Damages and Official/Individual Capacity Claims

  Defendants argue that the Eleventh Amendment bars damages against them in both their official and individual capacities. Wilder contends that the Eleventh Amendment does not bar a RLUIPA claim for damages in either Defendants' official or individual capacities. The Court agrees with Defendants.

> Section 3 of RLUIPA states that no government may impose a substantial burden on prisoner's religious exercise "in a program or activity that receives Federal financial assistance," 42 U.S.C. § 2000cc-1(b)(1), or in a way that affects interstate commerce, *id.* § 2000cc-1(b)(2). Regarding remedies, the statute provides that prisoners "may assert a violation of [RLUIPA] … and obtain *appropriate relief* against a government." *Id*. § 2000cc-2(a) (emphasis added). The question here is whether the term "appropriate relief" is sufficiently specific to waive a state's sovereign immunity to a suit for damages. In analyzing whether a sovereign has waived its immunity, we strictly construe the scope of any alleged waiver in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.E.2d 486 (1996). We may "not enlarge the waiver beyond what the language [of the statute] requires." *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 92

L.E.2d 250 (1986)(internal citations and quotation marks omitted). Consent to suit cannot be implied, *see id.*, and ambiguities are construed in favor of immunity, *see United States v. Nordic Village*, 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.E.2d 181 (1992).

***Nelson*, 570 F.3d at 883-884**.  In ***Nelson***, the Seventh Circuit adopted the approach of the Fourth and Fifth Circuits regarding whether states waived their sovereign immunity under RLUIPA, finding that "a statutory reference to 'appropriate relief' does not provide the 'unequivocal textual expression' necessary to effect a waiver of sovereign immunity in suits for damages," thereby shielding a defendant prison official from a monetary judgment in his or her official capacity under RLUIPA. ***Nelson*, 570 F.3d at 885**.  Further, the Seventh Circuit in ***Nelson*** stated succinctly: "[w]e decline to read RLUIPA as allowing damages against defendants in the individual capacities." ***Id*. at 889**.  Thus, the Court grants Defendants' motion for summary judgment as to this issue.

**Injunctive Relief**

Defendants maintain that Wilder's prayer for injunctive relief is moot now that he has been transferred from Pinckneyville.  Wilder counters that injunctive relief is not moot in that he is still in IDOC custody and every institution operates under the same Administrative Code.

Injunctive relief is not available unless a plaintiff can show an ongoing violation of federal law.  ***Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991); *Green v. Mansour*, 474 U.S. 64, 71 (1985)**.  Furthermore, the capable-of-

repetition doctrine applies only in exceptional situations, and generally only where the plaintiff can make a showing that he will again be subject to the alleged illegality. *Id.*; *see also Young v. Lane*, **922 F.2d 370, 373 (7th Cir. 1991)("Unaccompanied by any continuing, present injury or real and immediate threat of repeated injury, their past exposure to illegal conduct ... does not show a pending case or controversy requiring injunctive relief, and we must vacate as moot that portion of their prayer for relief.")** . "A court's power to grant injunctive only survives if such relief is actually needed. " *Nelson*, **570 F.3d at 882**.

After reviewing the original Complaint and the Amended Complaint, it does not appear that Wilder intended to state a claim against the IDOC for a state wide policy.[5] He limits the allegations to the Defendants' conduct during the time he was housed at Pinckneyville. As stated previously, Wilder is no longer incarcerated at Pinckneyville. Further, Defendants Pierson and Evans are no longer employed at Pinckneyville and Watts is no longer employed by the IDOC. The Court find that the named Defendants currently are not subjecting Wilder to an ongoing violation as to his religious beliefs. Thus, Wilder is not entitled to injunctive relief against Defendants.

### V. Conclusion

Accordingly, the Court **GRANTS IN PART and DENIES IN PART**

---

[5]In *Lehn v. Holmes*, **364 F.3d 862, 872 (7th Cir. 2004)**, the Seventh Circuit reversed the district court's finding that Lehn's environmental tobacco smoke claim against the IDOC was moot after Lehn was transferred to a different prison facility.

Defendant's motion for summary judgment (Doc. 80).   As this matter is proceeding to trial, the Court **APPOINTS** Steven Hanagan, Hanagan & Dousman, 901 North Street, P.O. Box 1358, Mount Vernon, IL 62864, to represent Wilder for trial purposes only.  In light of the appointment of counsel, the Court advises Wilder that he may not, in the future, file any pleadings pro se in this matter.   All further pleadings shall be filed and signed by appointed counsel.

> **IT IS SO ORDERED.**

> Signed this 21st day of December, 2010.

David R. Herndon
2010.12.21
15:37:46 -06'00'

> **Chief Judge**
> **United States District Court**